22-1175

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

BISHOP OF CHARLESTON, a Corporation Sole, d/b/a Roman Catholic Diocese of Charleston; SOUTH CAROLINA INDEPENDENT COLLEGES AND UNIVERSITIES, INC.,
*Plaintiffs – Appellants,*
v.
MARCIA ADAMS, in her official capacity as the Executive Director of the South Carolina Department of Administration; BRIAN GAINES, in his official capacity as budget director for the South Carolina Department of Administration; HENRY MCMASTER, in his official capacity as Governor of South Carolina,
*Defendants – Appellees*,
and
STATE OF SOUTH CAROLINA,
*Intervenor/Defendant – Appellee.*

---

On Appeal from the United States District Court
for the District of South Carolina

---

**BRIEF OF *AMICI CURIAE* PUBLIC FUNDS PUBLIC SCHOOLS, SOUTHERN EDUCATION FOUNDATION, AND ADVANCEMENT PROJECT NATIONAL OFFICE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

---

John M. Reagle, Fed. I.D. No. 7723
HALLIGAN MAHONEY WILLIAMS
SMITH FAWLEY & REAGLE, PA
jreagle@hmwlegal.com
P.O. Box 11367
Columbia, South Carolina 29211
(803) 254-4035

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... ii

INTEREST OF *AMICI CURIAE* .......... 1

SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 4

I. Private School Voucher Programs are Rooted in a History of Racism .......... 4

A. Voucher Programs Arose as a Tool to Resist School Integration, Eventually Forming a Key Part of the "Massive Resistance" to *Brown* .......... 4

B. Voucher Programs Proliferated as an Anti-Integration Strategy in the Post-*Brown* South .......... 7

C. The Rise of Vouchers in South Carolina, as in Other Southern States, Was Motivated by Resistance to Desegregation .......... 8

II. Private School Voucher Programs Have Enduring Segregative Effects .......... 11

A. Voucher Programs Continue to Exacerbate Racial Segregation in Schools .......... 11

B. Private Schools Nationally and In South Carolina Disproportionately Serve White Students .......... 13

CONCLUSION .......... 15

## TABLE OF AUTHORITIES

CASE LAW: PAGES

*Adams v. McMaster*, 851 S.E.2d 703 (S.C. 2020) ……………………………..….….2

*Bishop of Charleston v. Adams*, No. 2:21-CV-1093-BHH, 2022 WL 407405, at *7-*9
(D.S.C. Feb. 10, 2022)…….…………………………………………………...…...3

*Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 232–33
(1964)…………………………………………………………………….…....…6

*Coffey v. State Educ. Fin. Comm'n*, 296 F. Supp. 1389, App. B (S.D. Miss.
1969)……………………………………………………………………….....…..8

*Brown v. S.C. State Bd. of Educ.*, 296 F. Supp. 199, 202–03 (D.S.C. 1968);
*aff'd* 393 U.S. 222 (1968)…………….……………………………………....……9

*Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 461 (M.D. Ala. 1967),
*aff'd sub nom. Wallace v. United States*, 389 U.S. 215 (1967)……………….…..10

OTHER AUTHORITIES:

Kern Alexander & M. David Alexander, *American Public School Law* 219
(Wadsworth Cengage Learning, 8th ed. 2012)……………………………....…..3, 5

Molly Townes O'Brien, *Private School Tuition Vouchers and the Realities of Racial Politics*, 64 Tenn. L. Rev. 359, 364 (1997)……………………...….……4, 7

Steve Suitts, *Overturning* Brown*: The Segregationist Legacy of the Modern School Choice Movement* (2020); ……………………………….…...…..5, 8, 9, 14

Derek W. Black, *Schoolhouse Burning:*
*Public Education and the Assault on American Democracy* (2020);………...…….6

S. Educ. Found., *A History of Private Schools & Race in the American South*,

https://southerneducation.org/publications/history-of-private-schools-and-race-in-the-
american-south/ (last visited May 24, 2022)…………………………………….…5

Nancy MacLean, *How Milton Friedman
Exploited White Supremacy to Privatize Education,* Inst. for New. Econ. Thinking Working Paper Series No. 161 (Sept. 1, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3932454. ……..…………..5

Chris Ford et al., Ctr. for Am. Progress, *The Racist Origins of Private School Vouchers,* 2 (July 12, 2017), https://tinyurl.com/39recyef
(outlining the "[s]ordid history" of private school voucher programs).5, 6, 7, 11, 14

Jerome C. Hafter & Peter M. Hoffman, Note, *Segregation Academies and State Action*, 82 Yale L. J. 1436, 1440 & n.32 (1973)…………………..……………8

Raymond Pierce, *The Racist History of "School Choice*," Forbes (May 6, 2021), https://tinyurl.com/2m4cuzrx. .........................................................................3

Stephen P. Broughman, et al., Inst. of Educ. Scis., *Characteristics of Private Schools in the United States: Results From the 2019-20 Private School Universe Survey*, Table C-1 (Sept. 2021), https://nces.ed.gov/pubs2021/2021061.pdf..........8

Michael B. Shaffer and Bridget Dincher, *In Indiana, School Choice Means Segregation*, Phi Delta Kappan (Jan. 27, 2020), https://kappanonline.org/indiana-school-choice-means-segregation-shaffer-dincher………………..………………12

Helen Hershkoff & Adam S. Cohen, *School Choice and the Lessons of Choctaw County*, 10 Yale L. & Pol'y Rev. 1, 4 & n.10 (1992) ……………………..……10

Bill Bush, *White Students Disproportionately Use Ohio School Voucher Program*, Columbus Dispatch (Aug. 27, 2016), https://www.dispatch.com/content/stories/local/2016/08/28/white-students-disproportionately-use-ohio-school-voucher-
program.html..........................................................................................................12

Halley Potter, Century Found., *Do Private School Vouchers Pose a Threat to Integration?* 16 (Mar. 21, 2017), https://tinyurl.com/xah7p2mv…………………......13

Jongyeon Ee et al., *Private Schools in American Education: A Small Sector Still Lagging in Diversity* 15 (UCLA Civil Rights Project, Working Paper, 2018), https://tinyurl.com/surr7hfr. …......…………………………………………….……13

"CCD Data Files," *Common Core of Data: America's Public Schools*, Nat'l Ctr. for Educ. Statistics, https://nces.ed.gov/ccd/files.asp.......……………………….......14

*Private School Universe Survey*, Nat'l Ctr. for Educ. Statistics, https://nces.ed.gov/surveys/pss/ ……...…………………………………….……..14

Private School Review, *Private School Minority Statistics in South Carolina*, https://www.privateschoolreview.com/minority-stats/south-carolina ....................15

## INTEREST OF *AMICI CURIAE*

The *amici curiae* respectfully submit this brief to provide the Court with crucial background on the history of racism behind private school voucher programs and their present-day negative effects on school integration. No-aid clauses, such as Article XI, Section 4 of the South Carolina Constitution, are an essential bulwark against these harmful programs. *Amici* draw on their longstanding experience and expertise in civil rights and education law and policy to provide the Court with this crucial context.

**Public Funds Public Schools** ("PFPS") is a national campaign to ensure that public funds for education are used to maintain, support, and strengthen public schools. PFPS is a partnership between two non-profit civil rights organizations, Education Law Center and the Southern Poverty Law Center.

**The Southern Education Foundation** is a nonprofit organization supported by partners and donors committed to advancing equitable education policies and practices that elevate learning for low-income students and students of color in 17 southern states, including South Carolina.

**Advancement Project National Office** is a national multi-racial civil rights organization with a long history of racial justice work in the field of education.

Additional information about the *Amici*'s interest in this case and relevant expertise is included in the accompanying motion.

## SUMMARY OF ARGUMENT

An explicit goal of plaintiffs-appellants' challenge to the South Carolina Constitution's no-aid clause is to remove barriers to private school receipt of federal COVID-19 relief funding, thereby opening the door to private school vouchers.[1] Although plaintiffs-appellants claim the no-aid clause—Article XI, Section 4—was motivated by racial prejudice, *Amici* will show that in fact the private school voucher programs *prohibited* by that constitutional provision were born directly of racial animus in the mid-twentieth century and continue to foster and exacerbate racial segregation in schools. Thus, plaintiffs-appellants' claim of racial discrimination associated with Section 4 flies in the face of the reality that the no-aid clause actually blocks voucher programs that would exacerbate racial segregation in schools.

As discussed in plaintiffs-appellants' Amended Complaint, the Safe Access to Flexible Spending (SAFE) grant voucher program that was to be funded with money directed to South Carolina via the federal Coronavirus Aid, Relief, and Economic Security (CARES) Act was struck down by the South Carolina Supreme Court for violating Article XI, Section 4 in *Adams v. McMaster*, 851 S.E.2d 703 (S.C. 2020), and plaintiffs-appellants seek to reverse that result. Although the

[1] *Amici*'s brief addresses only those elements of the plaintiffs-appellants' claims relating to K-12 education and does not address the funding of institutions of higher education.

district court held it lacked jurisdiction in the instant case over the plaintiffs' challenge to Governor Henry McMaster's allocation of federal Governor's Emergency Education Relief (GEER) funds to uses other than the SAFE grant voucher program, *Bishop of Charleston v. Adams*, No. 2:21-CV-1093-BHH, 2022 WL 407405, at *7-*9 (D.S.C. Feb. 10, 2022), *Amici* submit this brief to provide relevant information in case this Court reaches the merits of that claim, as well as to provide the Court with general context about the importance of preserving the no-aid clause to prevent the harmful effects of K-12 private school voucher programs.

Private school voucher programs only arose in significant numbers after the U.S. Supreme Court invalidated *de jure* racial segregation in public schools in *Brown v. Board of Education*.[2] That is no coincidence. The uncomfortable truth is that today's private school voucher programs "have their roots in a history of racism and school segregation," as "school vouchers became a popular tool for perpetuating the segregation the Court had ruled unconstitutional."[3] While proponents of vouchers may no longer publicly express segregationist objectives, voucher programs continue to have significant *de facto* segregative effects. Article

---

[2] *See* Kern Alexander & M. David Alexander, *American Public School Law* 219 (Wadsworth Cengage Learning, 8th ed. 2012).

[3] Raymond Pierce, *The Racist History of "School Choice*," Forbes (May 6, 2021), https://tinyurl.com/2m4cuzrx.

XI, Section 4 of the South Carolina Constitution is the state's primary safeguard against these historically toxic, deeply harmful programs.

## ARGUMENT

Despite present-day rhetoric, the origins of private school voucher programs had little to do with a "need for greater autonomy, pervasive disappointment with the public schools, or mistrust of government."[4] Rather, vouchers were a means to resist court-ordered desegregation by abandoning public schools and then using public funds for private education.[5] Moreover, as demonstrated below, data shows that private schools today—including South Carolina's—still disproportionately serve white students and that voucher programs funding these schools continue to have segregative effects.

### I. Private School Voucher Programs are Rooted in a History of Racism

#### A. Voucher Programs Arose as a Tool to Resist School Integration, Eventually Forming a Key Part of the "Massive Resistance" to *Brown*

The segregationist history of the modern voucher movement is well

---

4 Molly Townes O'Brien, *Private School Tuition Vouchers and the Realities of Racial Politics*, 64 Tenn. L. Rev. 359, 364 (1997).

5 *Id.*

documented.[6] Prince Edward County, Virginia provides a prime example.[7] There, defiance of the *Brown* ruling was emblematic of the reactionary pushback that would become known as "massive resistance."[8] Individual public school facilities in several Virginia counties were closed pursuant to a law enacted by the state legislature in response to desegregation.[9] But in 1959, Prince Edward County took matters one step further when, defying an order from this Court directing the County to "take immediate steps" towards integration, it chose to close its entire public school system and offer white students vouchers rather than operate integrated public schools.[10]

In preparation for school closures, the County Board decided not to levy local taxes to fund public schools in the 1959-1960 school year, while adopting a new voucher system—called a "tuition grant program"—for students to use to

---

6 *See, e.g.*, Steve Suitts, *Overturning* Brown*: The Segregationist Legacy of the Modern School Choice Movement* (2020); Derek W. Black, *Schoolhouse Burning: Public Education and the Assault on American Democracy* (2020); S. Educ. Found., *A History of Private Schools & Race in the American South*, https://southerneducation.org/publications/history-of-private-schools-and-race-in-the-american-south/ (last visited May 24, 2022). Scholarly research documenting this history continues to mount. *E.g.* Nancy MacLean, *How Milton Friedman Exploited White Supremacy to Privatize Education,* Inst. for New. Econ. Thinking Working Paper Series No. 161 (Sept. 1, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3932454.

7 Chris Ford et al., Ctr. for Am. Progress, *The Racist Origins of Private School Vouchers,* 2 (July 12, 2017), https://tinyurl.com/39recyef (outlining the "[s]ordid history" of private school voucher programs).

8 *Id.*

9 Alexander & Alexander, *supra* note 3, at 219; Ford et al., *supra* note 8, at 2, 3.

10 Ford et al., *supra* note 8, at 3.

attend a nonsectarian private school or a public school nearby.[11] Around the same time, local residents organized to raise funds, build, and operate a whites-only local private school.[12] When the County's entire public school system closed down, white students continued their voucher-funded education at the Prince Edward Academy, a "segregation academy."[13] Black students were neither allowed to attend the Prince Edward Academy nor entitled to receive tuition grants to attend other private schools.[14] Black families refused an offer to open a private school for Black students, standing firm in their fight for public education and refusing to be complicit in school segregation.[15] Prince Edward Academy served as a model for the South of an all-white private school established to resist integration.[16]

The U.S. Supreme Court eventually held that the County's program violated the Fourteenth Amendment's Equal Protection Clause and directed the district court to enter an order that the public schools reopen.[17] However, the tainted

---

11 *Id.*

12 *Id.*

13 *Id.*

14 *Id.*

15 Black, *supra* note 7, at 182–83.

16 Ford et al., *supra* note 8, at 3. *See also The Closing of Prince Edward County's Schools*, Virginia Museum of History & Culture, https://virginiahistory.org/learn/historical-book/chapter/closing-prince-edward-countys-schools (last visited May 24, 2022).

17 *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 232–33 (1964).

legacy of Prince Edward County's experiment endured. Indeed, the County's Board of Supervisors soon approved a budget that allocated almost twice as much to the "tuition grants" for white students as it did to the entire, integrated public school system.[18] And although subsequent court rulings and the passage of laws including the Civil Rights Act of 1964 and the Elementary and Secondary Education Act of 1965 underscored that the strategy of massive resistance to *Brown* was illegitimate and illegal, other States would create their own schemes to use public moneys to fund whites-only private schools.

### B. Voucher Programs Proliferated as an Anti-Integration Strategy in the Post-*Brown* South

Voucher plans were a prominent feature of the legislation proposed and enacted in Southern states to thwart integration.[19] As early as 1951, legislatures in Georgia and other Southern states were considering measures to privatize education through vouchers, which were expressly linked to avoiding desegregation.[20] Attempts to privatize public education accelerated following the *Brown* decision. From 1954 to 1965, Southern states enacted approximately 450 laws to evade or block segregation, many of which facilitated the diversion of

---

18 Ford et al., *supra* note 8, at 4.

19 O'Brien, *supra* note 5, at 386.

20 *Id.* at 364, 385.

public education resources to benefit private schools.[21]

By 1965, seven states maintained tuition grant voucher programs that had the practical effect of incentivizing white flight from newly desegregated public schools.[22] In addition to Virginia, the states included Alabama, Georgia, Louisiana, Mississippi, North Carolina—and South Carolina.[23] In Mississippi, for example, the voucher program funded up to 96% of tuition at certain segregation academies.[24] Between 1950 and 1965, private school enrollment in the South increased by over half-a-million students.[25]

### C. The Rise of Vouchers in South Carolina, as in Other Southern States, Was Motivated by Resistance to Desegregation

South Carolina's efforts to avoid school desegregation began even before the *Brown* decision. In 1953, anticipating the U.S. Supreme Court's move toward desegregation, South Carolina voters approved a constitutional amendment eliminating the State's duty to educate all children, paving the way for a private

---

21 Suitts, *supra* note 7, at 13.

22 *Id.* at 17; Jerome C. Hafter & Peter M. Hoffman, Note, *Segregation Academies and State Action*, 82 Yale L. J. 1436, 1440 & n.32 (1973).

23 Hafter & Hoffman, *supra* note 23, at 1440 n.32.

24 *Coffey v. State Educ. Fin. Comm'n*, 296 F. Supp. 1389, App. B (S.D. Miss. 1969).

25 Suitts, *supra* note 7, at 12. In fact, according to current government data, the South still has the largest share of private schools and private school students in the country. Stephen P. Broughman, et al., Inst. of Educ. Scis., *Characteristics of Private Schools in the United States: Results From the 2019-20 Private School Universe Survey*, Table C-1 (Sept. 2021), https://nces.ed.gov/pubs2021/2021061.pdf.

school system and with the intention of avoiding racial desegregation.[26] The state legislature further advanced these goals with actions such as repealing compulsory public school attendance requirements, giving local districts authority over school enrollment and closures, and establishing tax exemptions for children attending private schools.[27]

In 1963, immediately following the admission, by federal court order, of the first Black student to a South Carolina state university since Reconstruction, the State enacted a voucher statute to pay for students to attend private schools.[28] The ostensible goal of the voucher program, according to Governor Donald Russell, was to introduce competition that "'would stimulate progress in public education.'"[29] However, in striking down the law as unconstitutional, the federal district court saw the voucher program for what it was. The court ruled that "the purpose, motive and effect of the Act is to unconstitutionally circumvent the requirement first enunciated in [*Brown*] that the State of South Carolina not discriminate on the basis of race or color in its public educational system."[30]

---

26 Suitts, *supra* note 7, at 12.

27 *Id.* at 41.

28 *Id.*

29 *Id.* at 42.

30 *Brown v. S.C. State Bd. of Educ.*, 296 F. Supp. 199, 202–03 (D.S.C. 1968); *aff'd* 393 U.S. 222 (1968). Plaintiffs-appellants fully admit, and detail, this racist history of private

Federal courts similarly held that the voucher laws in other Southern states were poorly disguised attempts to perpetuate racial segregation. For example, a U.S. district court concluded that Alabama's voucher program was "nothing more than a sham established for the purpose of financing with state funds a white school system."[31] However, despite the fact that all the tuition grant voucher statutes discussed above were eventually declared unconstitutional, substantial amounts of public money were transferred to private schools and these schools received crucial monetary support from state coffers at their inception.[32] The implausibility of plaintiffs-appellants' claims is exposed by the fact that the prohibition in South Carolina's no-aid clause runs contrary to these historical strategies of publicly funding private schools to perpetuate segregation. This constitutional prohibition remains crucial because, as discussed below, the effects

---

school voucher programs in South Carolina. Pl.'s Mot. Summ. J. at 27-29. However, they contend that the no-aid clause in the 1972 State Constitution was modified to permit scholarships for segregation academies. Plaintiffs-appellants persist in advancing this argument on appeal, Appellants' Br. at 43-46, despite the district court pointing out that "those scholarships had been invalidated years before Section 4's adoption," *Bishop of Charleston*, 2022 WL 407405, at *12, referencing the *South Carolina State Board of Education* ruling that came years before Section 4 was ratified. Plaintiffs-appellants' position also elides the larger point that Section 4 works broadly to restrict the establishment of voucher programs—including the SAFE grant voucher—which have a sordid history in the state and should continue to be rejected.

31 *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 461 (M.D. Ala. 1967), *aff'd sub nom. Wallace v. United States*, 389 U.S. 215 (1967).

32 Helen Hershkoff & Adam S. Cohen, *School Choice and the Lessons of Choctaw County*, 10 Yale L. & Pol'y Rev. 1, 4 & n.10 (1992).

of today's voucher schemes are disturbingly similar to those of their predecessors.

## II. Private School Voucher Programs Have Enduring Segregative Effects

### A. Voucher Programs Continue to Exacerbate Racial Segregation in Schools

Empirical evidence shows that vouchers continue to have the same segregative effects as when they were first implemented as a strategy to resist *Brown*'s command for school integration. A 2017 report describes the program currently operating in Indiana as a "case study" in the persistence of segregating effects of vouchers: "Indiana's voucher program increasingly benefits higher-income white students, many of whom are already in private schools, and diverts funding from all other students who remain in the public school system."[33] Indeed, the study reported that around 60% of Indiana voucher recipients came from white families, and around 50% had never attended a public school.[34] Meanwhile, Black students' participation in Indiana's program had declined from 24% to 12% since its inception in 2013.[35] Despite claims that voucher programs promote civil rights, another set of scholars concludes that "[t]he State of Indiana has actively engaged in a process that has effectively re-created the segregation academies that littered much of the southern United States in response to the 1954 *Brown v. Board of*

---

33 Ford et al., *supra* note 8, at 8.

34 *Id.*

35 *Id.*

*Education* decision."[36]

An analysis undertaken by an Ohio newspaper using data provided by the Ohio Department of Education found that the state's EdChoice voucher programs disproportionately served white students.[37] The analysis of 2014-2015 data for EdChoice vouchers concluded that the public schools in which students were eligible for vouchers were 61.3% Black, but Black students represented only 48.5% of those using a voucher to attend private schools that year.[38] In contrast, white students were 21.4% of the eligible population but made up 33.4% of voucher students.[39] When the EdChoice expansion program, a newer voucher targeted to Ohio's low-income students, was added to the analysis, "the enrollment [grew] even more disproportionately white."[40]

Voucher programs operating in already segregated communities can make matters worse. A Century Foundation study established that Black students in

---

[36] Michael B. Shaffer and Bridget Dincher, *In Indiana, School Choice Means Segregation*, Phi Delta Kappan (Jan. 27, 2020), https://kappanonline.org/indiana-school-choice-means-segregation-shaffer-dincher.

[37] Bill Bush, *White Students Disproportionately Use Ohio School Voucher Program*, Columbus Dispatch (Aug. 27, 2016), https://www.dispatch.com/content/stories/local/2016/08/28/white-students-disproportionately-use-ohio-school-voucher-program.html.

[38] *Id.*

[39] *Id.*

[40] *Id.*

Louisiana generally relied on vouchers to exit school systems in which they were overrepresented only to attend private schools where the same was true, while white students tended to leave public schools where their race was underrepresented to enroll in schools where it was the opposite.[41] As a result, only a third of all voucher transfers in Louisiana resulted in more integrated public and private schools, while the other two-thirds exacerbated segregation in either or both.[42] Based on the best available data, the Century Foundation's study concluded that "voucher programs on balance are more likely to increase school segregation than to decrease it or leave it at status quo."[43]

### B. Private Schools Nationally and In South Carolina Disproportionately Serve White Students

Private schools across the country disproportionately serve white students. A 2018 report showed that, nationally, white students were "substantially overrepresented" in private schools, while Hispanic and Black students were underrepresented.[44] Moreover, white private school students tend to enroll in overwhelmingly white schools; in 2012, two-thirds of white private school students

---

41 *See* Halley Potter, Century Found., *Do Private School Vouchers Pose a Threat to Integration?* 16 (Mar. 21, 2017), https://tinyurl.com/xah7p2mv.

42 *Id.* at 17.

43 *Id.* at 2.

44 Jongyeon Ee et al., *Private Schools in American Education: A Small Sector Still Lagging in Diversity* 15 (UCLA Civil Rights Project, Working Paper, 2018), https://tinyurl.com/surr7hfr.

attended "virtually 'exclusionary schools,'" where Black, Latino and Native American students represent 10% or less of total enrollment.[45] The 2017 report cited above found that private schools tend to have the largest overrepresentation of white students in the country, and "the strongest predictor of white private school enrollment is the proportion of black students in the local public schools."[46] In other words, private schools can facilitate and exacerbate white flight from public schools. In fact, Southern states began enacting a new round of voucher programs as students of color became the majority in the South's public schools in 2009.[47]

South Carolina is no exception to these national trends. The vast majority of private school students in South Carolina are white, and private schools serve a vastly disproportionate percentage of white students compared to public schools: in 2018, 82% of South Carolina private school students were white, compared to 51% of public school students.[48] Additionally, many private schools in South Carolina

---

45 Suitts, *supra* note 7, at 82.

46 Ford et al., *supra* note 8, at 7.

47 Suitts, *supra* note 7, at 78-79.

48 Public school information is derived from the Common Core of Data from the National Center for Education Statistics (NCES). *See* "CCD Data Files," *Common Core of Data: America's Public Schools*, Nat'l Ctr. for Educ. Statistics, https://nces.ed.gov/ccd/files.asp (last visited Oct. 5, 2021). To determine the private school percentage, PFPS generated South Carolina student counts by race weighted for overall population using a "SAS" dataset for the 2017–2018 school year compiled by NCES. *See Private School Universe Survey*, Nat'l Ctr. for Educ. Statistics, https://nces.ed.gov/surveys/pss/ (last visited Oct. 5, 2021).

are intensely segregated, with student bodies that are overwhelmingly white or overwhelmingly non-white—including over one hundred private schools enrolling 90% or more white students and more than forty private schools enrolling 90% or more (often 100%) students or color.[49]

These stark data show that private schools today, as historically in South Carolina, facilitate a segregated school landscape. As the evidence from multiple states shows, vouchers serve to exacerbate school segregation. Voucher programs therefore provide direct public support to systems of racially segregated schools that state governments should not underwrite.

## CONCLUSION

The *amici curiae* urge this Court to affirm the district court's grant of summary judgment to the defendants-appellees.

---

49 Private School Review, *Private School Minority Statistics in South Carolina*, https://www.privateschoolreview.com/minority-stats/south-carolina (last visited May 19, 2022).

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on May 26, 2022.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 26th day of May, 2022.

/s/ John M. Reagle
John M. Reagle

*Counsel for amici curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. 29(d) because it contains 3264 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that the attached *amici curiae* brief complies with the type-face requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word, version Office 365, 14-point Times New Roman font.

Executed this 26th day of May, 2022.

/s/ John M. Reagle
John M. Reagle

*Counsel for amici curiae*